UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TOMMIE SLACK,

               Plaintiff,

    v.

SARAH KARIKO, et al.,

               Defendants.

Case No. C20-05508-RSM-SKV

REPORT AND RECOMMENDATION

Plaintiff Tommie Slack is a state prisoner who is proceeding *pro se* and *in forma pauperis* in this civil rights action. Plaintiff alleges claims under 42 U.S.C. § 1983 for deficient medical care and treatment and for failure to protect from pain and further injury, in violation of the Eighth Amendment. Dkt. 66. This matter is before the Court on Defendants' motion for summary judgment (Dkt. 115), Plaintiff's motion to strike (Dkt. 123), and Plaintiff's second motion for appointment of counsel (Dkt. 127).

Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that Plaintiff's motion to strike and second motion for appointment of counsel be DENIED. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be GRANTED and that this case be DISMISSED with prejudice.

BACKGROUND

A.  Procedural History

Plaintiff initiated this matter on June 1, 2020.  Dkt. 1.  His *pro se* 42 U.S.C. § 1983 civil rights complaint named thirteen Defendants: Arieg Awad, Mary Colter, Mary J. Currey, Dale Fetroe, Ryan Herrington, Sarah Kariko, David Kenny, Frank Longano, Martha Newlon, Kenneth Sawyer, Stephen Sinclair, Deborah Tonhofer, and Lysle W. Williams.  Dkt. 5.  The original complaint alleged deliberate indifference to his serious medical needs in violation of the Eighth Amendment during his incarceration by the Washington State Department of Corrections (DOC).  *Id.*  The Court directed service of the complaint on September 30, 2020.  Dkt. 10.

On December 31, 2020, Plaintiff moved for appointment of counsel.  Dkt. 38.  The Court declined to appoint counsel, concluding that Plaintiff had not established exceptional circumstances justifying the appointment of counsel at that time.  Dkt. 44.  On April 2, 2021, counsel entered an appearance on Plaintiff's behalf.  Dkt. 45.  Plaintiff's counsel filed an amended complaint on December 8, 2021.  Dkt. 66.  The amended complaint alleges violations of the Eighth Amendment through failure to protect and deficient medical care and treatment, and names one additional Defendant, Sarah Landis.  *Id.*  On January 13, 2022, counsel filed a motion seeking to withdraw as Plaintiff's attorney.  Dkt. 70.  The Court granted Plaintiff's counsel's motion to withdraw and declined to direct the appointment of substitute counsel.  Dkt. 81.

After the close of discovery, Defendants filed a motion for summary judgment (Dkt. 115), together with the declarations of Salina Brown (Dkt. 116), Defendants' counsel Sarah Brisbin (Dkt. 117), and Defendant Frank Longano, M.D. (Dkt. 118).  Plaintiff moved to strike a number of the supporting documents submitted by Defendants.  Dkt. 123.  He then filed a

response to the motion for summary judgment (Dkt. 124) with accompanying declaration (Dkt. 125) and exhibits (Dkt. 126). The document containing the exhibits was filed under seal from the public because it appeared to contain sensitive information requiring redaction. Dkt. 126. Plaintiff also filed a second motion for appointment of counsel (Dkt. 127) with supporting memorandum (Dkt. 128). Defendants filed responses to Plaintiff's motion to strike (Dkt. 129) and to his second motion for appointment of counsel (Dkt. 130), as well as a reply in support of their motion for summary judgment (Dkt. 132).

On January 6, 2023, the Court issued an order directing the Clerk to redact the personal information from Plaintiff's exhibits (Dkt. 126) and unseal the redacted version of the document. Dkt. 133. The Court also granted Defendants leave to file a supplemental reply brief in support of their motion for summary judgment once the document was unsealed. *Id.* Plaintiff then filed a surreply to the motion for summary judgment (Dkt. 135), Defendants filed the authorized supplemental reply (Dkt. 136), and Plaintiff filed a second surreply (Dkt. 138).

On March 28, 2023, Defendants moved to stay the remaining pre-trial and trial deadlines pending the Court's ruling on their motion for summary judgment. Dkt. 142. In the interests of justice and judicial efficiency, the Court stayed this action pending resolution of the summary judgment motion. Dkt. 143. The Court determined that a response was not necessary to resolve the motion. Dkt. 143. On April 7, 2023, Plaintiff filed a response objecting to the motion to stay and to the Court's swift ruling on the motion. Dkt. 144.

B. Facts

Plaintiff was admitted to Olympic Correction Center in July 2018. On September 27, 2018, Plaintiff met with Defendant Newlon, an advanced registered nurse practitioner employed by DOC. Dkt. 116-1 at 7. Defendant Newlon documented a mass on the left side of Plaintiff's

upper back that was 10 to 12 centimeters in diameter, soft and non-tender. *Id.* at 8. In her

written progress note, she stated: "Lipoma on back present for some time. Not painful. Recent

enlargement." *Id.* On October 29, 2018, Plaintiff sent a health services kite complaining that he

had "a large lump in my back that's causing [severe] pain in my shoulder, leaving me unable to

sleep on my left side as well as restricting my movement." Dkt. 126 at 133. The response

indicated that Plaintiff would be scheduled for a medical appointment within one to two weeks.

*Id.*

Plaintiff filed a grievance on October 30, 2018, complaining of severe pain and loss of

circulation in his left arm and shoulder, and stating that he needed to have the lump removed

immediately. *Id.* at 144. The response stated: "Per medical this is not a life threatening issue

and should be pursued through regular channels." *Id.*

Plaintiff was seen by a medical provider on November 6, 2018. Dkt. 116-1 at 9. He

complained of decreased circulation in his left arm that he attributed to a "tumor" on his

shoulder. *Id.* The medical provider noted the presence of a "12 x 12 cm mass, soft [and] non-

tender." *Id.* The provider also noted Plaintiff's complaints that "pain will radiate intermittently

from [left] shoulder to [left] elbow or hand" and "[left] hand numb when he wakes up in the

middle of the night." *Id.* Plaintiff complained of "pain level '4' in [left] shoulder." *Id.*

On November 8, 2018, Defendant Newlon examined Plaintiff again. *Id.* at 10. Plaintiff

complained of left arm numbness and pain in both shoulders. *Id.* He said that the pain "feels

like a tear" and that he "feels 'heat' that goes into the palm of his hands." *Id.* Plaintiff denied

neck pain or shoulder injury. *Id.* He reported lifting weights regularly and "'doing a lot of push-

ups.'" *Id.* Defendant Newlon noted that the lump had been present for two to three months, but

1   Plaintiff felt that it had grown.  *Id.*  She measured the mass at 12 by 12 centimeters and took

2   photos of it.  *Id.*

3       After conducting mobility testing of his neck and shoulders, Defendant Newlon

4   determined that Plaintiff's symptoms suggested a partial rotator cuff tear in his left shoulder.  *Id.*

5   at 10-11.  She ordered x-ray imaging of Plaintiff's left shoulder and neck, as well as three Health

6   Status Reports (HSRs): a lower bunk, extra pillow, and extended bathroom use.  *Id.* at 10.  She

7   also recommended "stopping weightlifting and push-ups for now" due to the suspected rotator

8   cuff tear.  *Id.* at 11.  Her notes indicated that she planned to submit a request to the Care Review

9   Committee (CRC) for removal of the mass.  *Id.*

10      X-rays of Plaintiff's left shoulder and neck were taken on November 14, 2018.  *Id.* at 12-

11  13.  The x-rays showed moderate osteoarthritis and bone spurs in the left shoulder.  *Id.* at 12.

12  The cervical spine x-ray showed moderate degenerative changes as evidenced by "moderate to

13  severe disc space loss [that] extends from C3/4-C6/7."  *Id.* at 13.

14      On November 21, 2018, Defendant Newlon presented Plaintiff's case to the CRC,

15  requesting a "general surgery consult with treatment as indicated" for the mass on Plaintiff's

16  back.  *Id.* at 14; Dkt. 126 at 155.  The CRC's report included the following case synopsis:

17      60 year old with a [left] posterior shoulder/trunk mass that is 12cm diameter, soft,
        mobile and [non-tender] to palpation.  The patient reports that the mass had been
18      enlarging rapidly in the last few months.  He also [complains] that it is causing
        pain in his [left] shoulder that is sometimes burning and numbing and sometimes
19      stabbing.  Denies neck pain.  Does weight lifting and reports that he does "a lot of
        pushups."  Has [hypertension].  Lumbar [degenerative disc disease] and
20      spondylosis.  No pain to palpation of spinous processes of c-spine.  Good [range
        of motion] of the c-spine.  No muscular atrophy by visual inspection.  Has
21      evidence of partial rotator cuff tear on the [left].  *Photos sent in email to CRC
        members.

22

23

1    *Id.* The CRC determined that surgery was not medically necessary and recommended continued

2    clinical monitoring of the mass. *Id.* The report listed Defendants Colter, Awad, Newlon,

3    Tonhofer, Sawyer, and Herrington among the voting members present. *Id.*

4        Plaintiff filed a grievance on November 28, 2018, alleging that he was being denied

5    medical care for the lump, which was "caus[ing] [severe] pain and loss of circulation" in his left

6    arm. Dkt. 126 at 159. He claimed that the x-ray did not identify the lump and "[m]edical can't

7    give it a name," and stated, "I need to know what's wrong." *Id.* He was informed that this

8    complaint appeared to concern the same issue as his previous grievance and was directed to

9    rewrite the complaint if he intended to appeal the CRC decision. *Id.*

10        Between November 2 and December 4, 2018, Plaintiff sent nine kites regarding the lump

11    on his back and complaining of severe pain in his left shoulder. *See id.* at 134-42, 157. The

12    response to the last kite sent during that period stated: "Mr. Slack, You have already been

13    informed of your care plan. The kites you are sending constantly constitute harassment. Cease

14    this type of kiting or you will receive an infraction. Your follow-up appointment is in a week."

15    *Id.* at 142.

16        Plaintiff's next appointment was on December 11, 2018. Dkt. 116-1 at 15. He reported

17    increased pain and numbness in his left arm that he attributed to the mass. *Id.* He believed the

18    lump was "spreading to his left lat area" and again stated that he wanted it removed. *Id.*

19    Plaintiff did not complain of any motion deficits or inability to perform activities of daily life

20    (ADLs), and he was able to remove his shirt and demonstrate arm circles. *Id.* The provider

21    examined the mass and noted that it was approximately "12 cm x 11 cm, round without

22    expressed pain with palpation, not hot to touch, [and] mobile." *Id.* The provider recommended

23

1    that Plaintiff avoid pressure on the area and discussed with Plaintiff that his arthritis could be

2    causing the pain. *Id.*

3        In late December 2018, Plaintiff appealed the response to his November grievance,

4    arguing that he was only being offered medication that "can damage my liver or cause a heart

5    attack or stroke" to manage his severe pain, and reiterating that he wanted the lump removed.

6    Dkt. 126 at 160. He stated that he was being threatened with an "infraction which could take my

7    DOSA judgment if I continue to send medical kite[s] for the [severe] pain I've been suffering"

8    and contended that he had to choose between "suffer[ing] pain or los[ing] my DOSA." *Id.*

9        In January 2019, Plaintiff was transferred to Washington Corrections Center. He had a

10   medical appointment on January 17, 2019, at which he complained of chronic back pain. Dkt.

11   116-1 at 16. The provider noted a "large lipoma, soft, moveable" on Plaintiff's back and planned

12   to "watch, wait, consider biopsy given size." *Id.* Plaintiff was prescribed salsalate to manage his

13   chronic back pain and arthritis. *Id.*; *see also* Dkt. 126 at 131 (Patient Medication Information

14   stating that salsalate is "used to treat arthritis").

15       The investigation of Plaintiff's level two appeal of his November grievance concluded on

16   February 5, 2019, and concurred with the CRC that surgery was not medically necessary at that

17   time. Dkt. 126 at 160. The response encouraged Plaintiff to review the DOC policy regarding

18   offender-paid heath care if he wanted the lump surgically removed. *Id.* Plaintiff then appealed

19   to level three, alleging that an investigator had refused a request to look at his back. *Id.* at 161.

20       In March 2019, Plaintiff was transferred to Coyote Ridge Corrections Center. On March

21   27, 2019, he was seen by Defendant Landis, a physician assistant employed by DOC, to request a

22   renewal of his HSRs. Dkt. 116-1 at 18. Plaintiff stated that he had had chronic pain in his low

23   back, right knee, and shoulder for multiple years. *Id.* He described the pain as constant and

"about a 6/10," but stated that stretching helped decrease the pain and the salsalate provided some relief. *Id.* He denied excessive exercising, numbness, or tingling. *Id.* Defendant Landis noted a "large approximately 7 cm x 7 cm superficial soft mobile mass located at the left posterior shoulder resembling a lipoma and is mildly tender to palpation." *Id.* She renewed his HSR for a lower bunk and instructed Plaintiff to follow up with his primary care provider in one month, or sooner if needed, for the left shoulder mass and chronic back and knee pain. *Id.*

On April 3, 2019, Defendant Currey signed a response to Plaintiff's level three appeal of his November grievance. Dkt. 126 at 161. She stated that she had reviewed the initial grievance, appeals, investigation, and responses, and found that the grievance was not supported. *Id.* She noted that clinical monitoring was continuing in accordance with the CRC's recommendation, and Plaintiff remained free to pursue additional care at his own expense. *Id.*

Plaintiff was next seen regarding the mass on May 31, 2019, when he again met with Defendant Landis. Dkt. 116-1 at 21. He felt that the mass was growing and stated that it was "painful, constant, and aching, rated 10/10 that intermittently cramps and causes numbness over his left trapezius region." *Id.* He stated that salsalate helped with the pain. *Id.* He reported that he was not exercising, there were no changes to his ADLs, and he did not have difficulty getting dressed. *Id.* Defendant Landis measured the mass at approximately 12.5 by 12.5 centimeters and noted that it was mildly tender to palpation. *Id.* She also noted a second lesion, also soft and mildly tender to palpation, measuring approximately 9.5 by 4.5 centimeters. *Id.* Defendant Landis wrote that these lesions were "likely lipomas" and noted Plaintiff's desire to have them removed. *Id.* She requested ultrasound imaging of the masses and advised Plaintiff to continue managing his pain with salsalate and Tylenol. *Id.*

The ultrasound of Plaintiff's left shoulder took place on June 19, 2019. *Id.* at 22. The ultrasound showed masses "measuring up to 9 x 2.7 x 4.4 cm and 4 x 1.3 x 1.3 cm without significant internal vascularity," suggesting that they were lipomas. *Id.*

On July 10, 2019, Plaintiff met with Defendant Landis to discuss "next step for lipoma management." *Id.* at 23. Plaintiff had "kited multiple times" about the lipomas, felt that he was "in intractable and chronic pain," and requested that his case be presented to the CRC again for surgery to remove the masses. *Id.* Defendant Landis noted that the lesions had not changed in size or appearance since Plaintiff's last evaluation. *Id.* She wrote an HSR for an additional pillow because of Plaintiff's report that "when he positions his arm and shoulder, it helps relieve some pain and pressure from the large lipoma." *Id.* at 23-24.

The CRC again reviewed Plaintiff's case and issued the following report on July 17, 2019:

> 61 [year old] male with 2 [ultrasound] confirmed lipomas located over the left teres minor region and midaxillary line. [Patient complains of] "intractable, chronic, and substantial pain for months." Lesions measure on [ultrasound] 9 x 2.7 x 4.4 cm, and 4 x 1.3 x 1.3 cm. Lesions have not changed in appearance or size from evaluation to evaluation. [Patient] is requesting a CRC presentation for general surgery with diagnostics and treatment as indicated. ** Case presented as above, attached pictures referred to. Patient reports they are tender to palpation. Patient reports no impact to ADL's. Committee recommends continued clinical monitoring. The committee discussed the intervention and decided that it was NOT medically necessary.

Dkt. 126 at 191. The report listed Defendants Landis, Fetroe, Williams, Herrington, Sawyer, and Longano among the voting members present. *Id.*

Between May 13 and August 23, 2019, Plaintiff sent fifteen kites concerning the lump and the pain in his back and shoulder. *See* Dkt. 126 at 168-80, 194-95, 217. He submitted two additional grievances regarding his medical care during this period. *See* Dkt. 126 at 184, 196.

In August 2019, Plaintiff was transferred to Monroe Correctional Center. Plaintiff was seen on September 16, 2019, and the provider noted that multiple evaluations from other facilities' providers had diagnosed the lump on Plaintiff's shoulder as a lipoma and ultrasound and x-ray examinations had been performed. Dkt. 116-1 at 28. The provider noted that DOC had denied excision in the past and Plaintiff was requesting a biopsy on the mass. *Id.* The mass was measured at 12 by 13 centimeters. *Id.* Plaintiff denied any muscle weakness or numbness. *Id.* He was instructed to continue self-monitoring of the mass and return to the clinic if symptoms worsened. *Id.*

On October 8, 2019, Plaintiff presented at sick call wanting to discuss removal of the mass and was encouraged to sign up for a medical appointment. *Id.* at 31. He met with a medical provider on October 14, 2019, who measured the lumps at approximately 10 by 10 centimeters and 5 by 5.5 centimeters and noted both were non-mobile and not tender to palpation. *Id.* at 32. Plaintiff voiced concern about the lumps and "was under the impression that he will have referral for needle biopsy." *Id.* He was prescribed meloxicam and capsaicin cream for pain management, and the provider noted that he would "contact PA-C Landis regarding needle biopsy plan." *Id.*; *see also* Dkt. 126 at 220 (Patient Medication Information stating that meloxicam is "used to treat some types of arthritis").

At a medical appointment on December 2, 2019, Plaintiff stated that he believed the mass had grown and was causing him increased pain. Dkt. 116-1 at 35. He said that he usually sleeps on his left side but doing so caused his arm to go numb. *Id.* Plaintiff reported that he was "told to have a needle biopsy [and] would like to proceed [with] that." *Id.* The medical provider measured the two round, soft lumps on Plaintiff's back at approximately 10 centimeters and 7 centimeters in diameter. *Id.* The provider submitted a referral for a biopsy. *Id.*

Plaintiff sent six kites regarding the lumps between September 2 and December 29, 2019. *See* Dkt. 126 at 204-09.  On December 17, 2019, Defendant Currey found Plaintiff's June grievance regarding his medical care to be partially supported on level three appeal:

> Measurements from the ultrasound measure up to 9 x 2.7 x 4.4 cm and 4 x 1.3 x 1.3 cm respectively.  The ultrasound was requested by PA-C Landis, and approved at Level 1.  While an ultrasound is an accurate test for a suspected lipoma, it cannot rule out any malignancy, such as a liposarcoma as you suggested.
>
> You have been consistently monitored by your practitioners, who have prescribed medications and a Health Status Report (HSR) for a pillow to help alleviate your discomfort.  You were presented to the Care Review Committee (CRC) for a general surgery consult, to include diagnostics and treatment, however the information presented stated "confirmed lipomas," which may not be accurate based only upon ultrasound results.  It was also presented that the masses have not changed in size, yet earlier documentation supported the presence of only a single mass and there is some evidence that they grew slightly.
>
> Your grievance is partially supported.
>
> Your practitioners have consistently monitored your health.  You should continue to work with your healthcare team in moving forward with appropriate diagnostic testing and treatment based upon final results.

*Id.* at 187.

Plaintiff was seen at sick call on January 21, 2020, complaining that the lumps were causing increased pain and preventing him from sleeping. Dkt. 116-1 at 36.  The provider measured the large mass at about 12 by 12 centimeters.  *Id.*  The provider noted that Plaintiff had an "approved consult for CT scan [and] surgical consult for biopsy" and planned to resubmit a request for surgical removal of the masses at Plaintiff's request.  *Id.*  The provider submitted a consultation request for surgical removal of the lumps the same day.  *Id.* at 37.  The request was approved by Defendant Awad, who then presented the case to the CRC on January 27, 2020.  *Id.* at 37-38.  The CRC approved surgical removal of the lumps on Plaintiff's shoulder.  *Id.* at 38.

1      The CT scan of Plaintiff's left shoulder was performed on February 12, 2020.  *Id.* at 40;

2  Dkt. 126 at 213-14.  The scan measured the large mass at 10.7 by 11.2 by 5.6 centimeters, and

3  the provider found that it did not have any features suggesting that it was a liposarcoma.  Dkt.

4  126 at 214.  The provider noted that, "if there has been recent growth, a low-grade liposarcoma

5  cannot be completely excluded; however, based on imaging characteristics, this is almost

6  certainly a benign lipoma."  *Id.* at 215.  The second mass did not appear on the scan, and the

7  provider noted that "a solid soft tissue lesion could be missed amongst the muscular tissues on

8  this noncontrast CT."  *Id.*  The scan also showed mild to moderate osteoarthritis in Plaintiff's

9  shoulder.  *Id.*

10      On February 29, 2020, Washington State Governor Jay Inslee declared a State of

11  Emergency due to the COVID-19 pandemic.  Dkt. 118-1 at 111-12.  On March 19, 2020,

12  Governor Inslee prohibited "all hospitals [and] ambulatory surgical facilities … in Washington

13  State from providing health care services, procedures, and surgeries that, if delayed, are not

14  anticipated to cause harm to the patient within the next three months."  *Id.* at 113-14.  The

15  prohibition allowed for limited exceptions, including "treatment for patients with

16  emergency/urgent needs" (such as heart attacks and strokes) and "surgery that if delayed or

17  canceled would result in the patient's condition worsening (for example, removal of a serious

18  cancerous tumor . . . )."  *Id.* at 114.  On May 18, 2020, the restriction on non-urgent medical and

19  dental procedures was extended.  *Id.* at 116-21.

20      On April 21, 2020, Plaintiff was seen by a medical provider at Stafford Creek Correction

21  Center.  Dkt. 116-1 at 43.  The provider noted the two masses on Plaintiff's shoulder, "which he

22  attributes to left shoulder pain and left arm pain," and opined that they seemed "consistent with

23  lipoma."  *Id.*  Plaintiff stated that he had not been exercising due to shoulder pain that radiated

down his arm and that he had pain when brushing his teeth with his left hand. *Id.* The provider found limited mobility in Plaintiff's left shoulder. *Id.* The provider noted that Plaintiff had been approved for surgical lump removal and planned to "check with the out trip schedulers on this but right now everything I am sure is on hold due to the Covid 19 pandemic." *Id.* The provider also discussed with Plaintiff that his left shoulder pain "may be independent from the suspected lipoma" and opined that it seemed to be "fairly classic shoulder pain both by his history and exam as well as the CT report of arthritis in the shoulder." *Id.* at 44. Plaintiff was prescribed diclofenac gel and referred for physical therapy on his left shoulder. *Id.* at 44, 46.

Plaintiff was seen on May 4, 2020, for a thumb injury and asked about the status of the lump removal. *Id.* at 47. The provider discussed his "questions about medical necessity in the midst of the Covid 19 pandemic" and planned to check again with the "out trip schedulers" on the matter. *Id.* Plaintiff attended physical therapy on June 11, 2020, and the provider recommended some exercises and stretches to promote and preserve mobility in his left shoulder but did not think Plaintiff would benefit from additional physical therapy. *Id.* at 50.

On June 16, 2020, Plaintiff had an initial visit with Dr. Jonathan Gifford at Grays Harbor Surgeons. *Id.* at 53. Dr. Gifford measured the larger mass at 12 by 13 centimeters and the smaller mass at 7 by 4 centimeters. *Id.* at 55. He noted that there were "[n]o overlying skin color changes" and that the "tenderness on palpation is actually above the larger mass." *Id.* Dr. Gifford noted his impression that the masses were lipomas and recommended that Plaintiff continue using the salsalate, diclofenac gel, and meloxicam. *Id.* at 56.

At a pre-surgery medical appointment on June 29, 2020, a DOC provider opined that the mass was "[consistent with] benign lipoma" and that the physical examination and Plaintiff's symptoms supported surgical intervention. *Id.* at 57. The provider "reassured" Plaintiff that the

1  "mass(es) [were] most likely benign" and warned him that "pain may NOT be relieved [with]

2  surgical intervention." *Id.*

3      Plaintiff had a follow-up appointment with Dr. Gifford on July 29, 2020. *Id.* at 58. The

4  masses were measured at 15 by 14 centimeters and 5 by 8 centimeters. *Id.* at 60. Plaintiff

5  reported that the masses were continuing to enlarge, "causing more difficulty with his daily

6  activities," and that he had occasional swelling pain going down the arm. *Id.* at 58. Dr. Gifford

7  and Plaintiff discussed the "risks, benefits, and alternatives," and Plaintiff "desire[d] to proceed

8  forward with excisional biopsy of left shoulder and left chest likely lipoma." *Id.* at 60. On

9  August 10, 2020, a pre-surgery ultrasound showed "two ovoid masses," which measured 4.48 by

10  2.85 by 4.71 centimeters and 3.72 by 1.29 by 3.14 centimeters and "demonstrate[d] fatty

11  echotexture, compatible with lipomatous lesions." *Id.* at 61.

12      Plaintiff underwent surgery to remove the masses on September 1, 2020. *Id.* at 72-73.

13  Biopsies identified tissue from both masses as "[m]ature encapsulated adipose tissue, consistent

14  with lipoma." *Id.* at 74. On October 9, 2020, Plaintiff had a follow-up visit with Dr. Gifford, at

15  which he reported that he was "still having pain the left shoulder and cannot sleep on that side."

16  *Id.* at 85. Dr. Gifford noted that he informed Plaintiff, "as I have said from the beginning," that

17  lipomas do not usually cause pain, but "usually push things out of the way." *Id.* at 87. Because

18  Plaintiff continued to complain of pain in his left shoulder, Dr. Gifford recommended

19  "evaluation of his shoulder looking for other causes of pain." *Id.* Plaintiff felt that there had

20  been some improvement since the lipoma removal. *Id.*

21      On November 2, 2020, Plaintiff had another medical appointment at which he

22  complained of persistent left shoulder pain. *Id.* at 89. Plaintiff had not renewed the meloxicam

23  or purchased any over-the-counter pain medication. *Id.* The provider noted that the surgical

1    incisions appeared well-healed, and that Plaintiff stated there had been no relief of his pain since

2    the lipoma removal.  *Id.*

3                                                  DISCUSSION

4         A.   Motions to Strike

5              As a preliminary matter, both parties seek to strike a number of submissions by their

6    opponent.  *See* Dkts. 123, 132, 136.  Plaintiff moves to strike the declaration of Defendant

7    Longano (Dkt. 118) and two exhibits attached to the declaration of defense counsel (Dkt. 117).

8    Dkt. 123.  Defendants seek to strike much of Plaintiff's declaration (Dkt. 125), certain

9    accompanying exhibits (Dkt. 126), and Plaintiff's surreply opposing summary judgment (Dkt.

10   135).  Dkt. 136 at 1-4.

11             The Court may consider only admissible evidence in ruling on a motion for summary

12   judgment.  *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R.

13   Civ. P. 56(e).  Generally, all evidence that tends to make a material fact more or less probable is

14   admissible unless forbidden by the United States Constitution, a federal statute, or federal rules.

15   Fed. R. Evid. 401, 402.  A party may object to documentation cited by the opposing party to

16   support an assertion of fact on the grounds that the cited material would not be admissible in

17   evidence.  Fed. R. Civ. P. 56(c)(2).  Admissible declarations or affidavits must be based on

18   personal knowledge, must set forth facts that would be admissible in evidence, and must show

19   the declarant or affiant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).

20   Declarations will often be self-serving, "'otherwise there would be no point in [a party]

21   submitting [them].'"  *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (quoting *U.S. v. Shumway*,

22   199 F.3d 1093, 1104 (9th Cir. 1999)) (alterations in original).  Unless a declaration states only

23

conclusions or facts not within the personal knowledge of the declarant, the self-serving nature of a declaration goes to its credibility, not to its admissibility.  *Id.*

       1.  <u>Plaintiff's Motion to Strike</u>

      First, Plaintiff argues that Defendant Longano's declaration should be stricken because the medical conclusions in the declaration are "not supported by any medical records," Defendant Longano's opinions on the source of Plaintiff's pain are "clear conjecture" because he has never met or examined Plaintiff, and the declaration is self-serving.  Dkt. 123 at 4-5.

      In his declaration, Defendant Longano states that he earned his medical degree in 2004 and has been licensed to practice medicine in Washington since 2008.  Dkt. 118 at 1.  He has been employed by DOC as a physician since 2008 and has served as DOC Deputy Chief Medical Officer since 2018.  *Id.* at 2.  He states that all opinions in his declaration are based on his education and clinical experience, his review of Plaintiff's DOC medical records, and "reasonable medical probability."  *Id.*

      Defendant Longano does not claim to have personally examined Plaintiff, and his declaration makes clear that his medical opinions are based on a review of Plaintiff's medical records.  The declaration cites to specific sections of the medical records as bases for his conclusions.  Although the declaration was submitted as part of his defense and is therefore self-serving, it states facts based on Defendant Longano's personal knowledge of DOC procedures and review of Plaintiff's medical records as well as opinions based on his medical education and experience.  Plaintiff has not shown that the declaration should be stricken.

      Next, Plaintiff seeks to strike two exhibits attached to the declaration of defense counsel that contain documents from a previous lawsuit filed by Plaintiff, *Slack v. Washington Department of Correction Care Review Committee, et al.*, Case No. C19-5557-BHS-TLF, in

which Plaintiff sought injunctive relief regarding medical care for the lumps on his back.  Dkt.
123 at 5-7.  The challenged exhibits include a declaration of Vrajesh Patel and the Court's
Report and Recommendation.  *Id.*

Plaintiff's objection to the Report and Recommendation appears to concern the fact that it
cites a declaration of Defendant Longano in which he again opines on the source of Plaintiff's
back pain.  *Id.* at 6.  Plaintiff contends that, for the same reasons that he challenged Defendant
Longano's declaration in the current case, "any and all affidavits and/or declaration[s] submitted
by Dr. Frank Longano must be [stricken]."  *Id.*  As noted above, Plaintiff has not demonstrated
that any declaration by Defendant Longano is inadmissible, nor has he identified any other basis
for striking the exhibit.

Plaintiff states that Vrajesh Patel is an inmate at Monroe Correction Center and not a
DOC employee or one of Plaintiff's treating physicians.  *Id.*  Plaintiff argues that the exhibit is
immaterial to the current case.  *Id.* at 6-7.  Defendants respond that Plaintiff chose Dr. Patel as
his expert in the previous case and that his opinions on the general treatment for lipomas and
assessment of Plaintiff's condition are directly at issue here.  Despite Plaintiff's objections, the
exhibit appears to be minimally relevant.  Accordingly, the Court recommends Plaintiff's motion
to strike (Dkt. 123) be DENIED.

2.  <u>Defendants' Motion to Strike</u>

Defendants included a motion to strike in their reply in support of summary judgment and
renewed the motion in their supplemental reply.  Dkts. 132, 136.   First, they object to much of
Plaintiff's declaration (Dkt. 125) on the grounds that it is argumentative and conclusory.  Dkts.
132 at 1-3; 136 at 3.  They also seek to strike portions of Plaintiff's exhibits as irrelevant or

1   improper opinion.  Dkt. 136 at 1-3.  Finally, Defendants request that the Court strike Plaintiff's

2   surreply (Dkt. 135) to their reply in support of summary judgment.  *Id.* at 3-4.

3          Objections to evidence because the evidence is irrelevant, speculative, argumentative,

4   vague and ambiguous, or constitutes an improper legal conclusion are duplicative of the

5   summary judgment standard itself.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110,

6   1119-20 (E.D. Cal. 2006).  Summary judgment can only be awarded when there is no genuine

7   dispute of *material* fact.  *See* Fed. R. Civ. P. 56.  "The Court cannot rely on irrelevant facts, and

8   thus relevance objections are redundant."  *Gaub v. Prof'l Hosp. Supply, Inc.*, 845 F. Supp. 2d

9   1118, 1128 (D. Idaho 2012).  To the extent that statements in Plaintiff's declaration and exhibits

10  do not meet the requirements of Rule 56, they will not be considered by the Court.

11         The Local Civil Rules permit a surreply for the specific purpose of requesting that the

12  Court strike material contained in or attached to a reply brief.  Local Rules W.D. Wash. LCR

13  7(g).  The Rule requires the party to "file a notice of intent to file a surreply as soon after

14  receiving the reply brief as practicable."  *Id.*  The Rule also specifies that the surreply "shall be

15  strictly limited to addressing the request to strike.  Extraneous argument or a surreply filed for

16  any other reason will not be considered."  *Id.*

17         Plaintiff's surreply does not appear to contain any request to strike material in

18  Defendants' supplemental reply, nor did Plaintiff comply with the procedures set out in LCR

19  7(g)(2).  *See* Dkt. 135.  Therefore, the Court recommends that Defendants' motion to strike be

20  GRANTED IN PART and Plaintiff's unauthorized surreply (Dkt. 135) be STRICKEN.  Plaintiff

21  also filed an additional surreply following the Defendants' supplemental reply that does not

22  appear to be authorized under LCR 7(g).  *See* Dkt. 138.  Similarly, the Court recommends that

23  this second unauthorized surreply (Dkt. 138) be STRICKEN.

1

B.  <u>Defendants' Motion for Summary Judgment</u>

2

1.  <u>Legal Standards</u>

3

a.  <u>Summary Judgment</u>

4

The Court shall grant summary judgment if the movant shows there is no genuine dispute

5

as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

6

56(a).  The moving party bears the initial burden to demonstrate the absence of a genuine dispute

7

of material fact for trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  A genuine dispute

8

concerning a material fact is presented when there is sufficient evidence for a reasonable jury to

9

return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253

10

(1986).  A "material" fact is one which is "relevant to an element of a claim or defense and

11

whose existence might affect the outcome of the suit," and the materiality of which is

12

"determined by the substantive law governing the claim."  *T.W. Elec. Serv., Inc. v. Pacific Elec.*

13

*Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

14

"If the moving party shows the absence of a genuine issue of material fact, the non-

15

moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

16

issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (quoting *Celotex*,

17

477 U.S. at 323-24).  A plaintiff must "produce at least some significant probative evidence

18

tending to support" the allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921

19

F.2d 959, 963 (9th Cir. 1990).  The nonmoving party is required to present specific facts and

20

cannot rely on conclusory allegations.  *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

21

The court must determine whether the specific facts that are presented by the non-moving party,

22

considered along with undisputed context and background facts, would show that a rational or

23

1   reasonable jury might return a verdict in the non-moving party's favor based on that evidence.

2   *Emeldi v. Univ. of Or.*, 698 F.3d 715, 728-29 (9th Cir. 2012).

3          When the Court considers a motion for summary judgment, "[t]he evidence of the non-

4   movant is to be believed, and all justifiable inferences are to be drawn in . . . favor" of the non-

5   moving party. *Anderson*, 477 U.S. at 255. The Court is not allowed to weigh evidence or decide

6   credibility. *Id.* The Court may not disregard evidence solely based on its self-serving nature.

7   *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

8                  b.  42 U.S.C. § 1983

9          To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct

10  complained of was committed by a person acting under color of state law, and (b) the conduct

11  deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the

12  United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by*

13  *Daniels v. Williams*, 474 U.S. 327 (1986). The causation requirement of Section 1983 is

14  satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

15  another's affirmative act, or omitted to perform an act that he was legally required to do that

16  caused the deprivation complained of. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

17                 2.  Personal Participation of Defendants Kariko, Sinclair, and Currey

18         Defendants first argue that Plaintiff has not shown that Defendants Kariko, Sinclair, and

19  Currey personally participated in the alleged deprivation of rights. Dkt. 115 at 12-13. To obtain

20  relief under 42 U.S.C. § 1983, Plaintiff must show that each Defendant caused or personally

21  participated in causing the deprivation of a particular protected constitutional right. *Arnold v.*

22  *IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981). Defendants in a Section 1983 action cannot be held

23  liable based on a theory of *respondeat superior* or vicarious liability. *Polk Cnty. v. Dodson*, 454

U.S. 312, 325 (1981).  Vague and conclusory allegations of official participation in civil rights

violations are not sufficient to state a claim for relief.  *Pena v. Gardner*, 976 F.2d 469, 471 (9th

Cir. 1992).  Plaintiff must set forth specific facts showing a causal connection between each

defendant's actions and the harm allegedly suffered by Plaintiff.  *Leer*, 844 F.2d at 634.

Defendants argue that Plaintiff has not shown that Defendants Kariko, Sinclair, and

Currey personally participated in the alleged denial of medical care.  Dkt. 115 at 12-13.  Plaintiff

responds that these three Defendants "failed to create a procedure to appeal or grieve the denial

of a medical decision."  Dkt. 124 at 23.  Defendants reply that this claim is outside the scope of

those pled in Plaintiff's amended complaint.  Dkt. 132 at 3-4.

In Plaintiff's amended complaint, which was prepared by counsel, he alleges that

Defendants violated his Eighth Amendment rights by providing "deficient medical care and

treatment for growths on his back and/or body," and failing "to protect him against wrongful,

needless and/or unnecessary pain as well as physical injury by failing to treat him for his

condition in a timely and appropriate manner."  Dkt. 66 at 10.  In his *pro se* response to

Defendants' motion for summary judgment, he states that "[t]his lawsuit challenges the

Washington Department of Corrections [continual] and regular practice of withholding necessary

medical care[.]"  Dkt. 124 at 2.  He further states that "DOC's inadequate preapproval system

continued to deny medically necessary treatment for [his] very painful condition by allowing a

committee of clinicians and administrators who have no familiarity with him to override a

clinical recommendation submitted by [his] primary care provider."  *Id.*

An amended complaint supersedes the original in its entirety, the latter being treated

thereafter as non-existent.  *Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir.

2015).  Where a complaint does not include specific factual allegations necessary to make out a

1   claim, raising the claim on summary judgment is insufficient to present the claim to the Court.

2   *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008); *see also Pickern v. Pier

3   1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (finding that factual allegations

4   raised for the first time in response to a motion for summary judgment could not be considered

5   part of the original complaint under the notice pleading requirements of Federal Rule of Civil

6   Procedure 8(a)).

7       Although Plaintiff's amended complaint challenges, among other things, the denials of

8   surgery by the CRCs and the responses to his grievances and appeals, it does not challenge the

9   DOC's general practice of using CRCs to manage patient care or its alleged failure to create an

10  adequate system to appeal medical decisions.  The Court will consider only the allegations

11  against these Defendants that fall within the Eighth Amendment claims in the amended

12  complaint.

13          a.   Defendant Kariko

14      Defendant Kariko is identified in the amended complaint as a "doctor employed by

15  DOC."  Dkt. 66 at 2.  Defendants argue that Defendant Kariko's only role in Plaintiff's care

16  occurred in January 2020, when she served on the CRC that approved him for surgery.  Dkt. 115

17  at 13.  They contend that Defendant Kariko never treated Plaintiff, cannot be held responsible

18  under a theory of vicarious liability, and was only involved in Plaintiff's care to approve the

19  surgery that he had requested.  *Id.*

20      Plaintiff has not shown that Defendant Kariko personally participated in providing him

21  deficient medical care or failing to protect him from unnecessary pain.  The Court recommends

22  that Defendant Kariko be DISMISSED as a Defendant in this case.

23

1

   b.  Defendant Sinclair

2    Defendant Sinclair is also identified in the amended complaint as a "doctor employed by

3  DOC." Dkt. 66 at 2.  Defendants state that this characterization is incorrect, and that Defendant

4  Sinclair is not a doctor or any other type of medical provider, but rather the former Secretary of

5  the DOC.  Dkt. 115 at 13.  They argue that Plaintiff has not presented any facts showing that

6  Defendant Sinclair was made aware of Plaintiff's lipoma.  *Id.*

7    Plaintiff has not pointed out any involvement by Defendant Sinclair in his medical care,

8  nor is any involvement evident in the record.  The Court recommends that Defendant Sinclair be

9  DISMISSED as a Defendant in this case.

10

   c.  Defendant Currey

11   Plaintiff also identifies Defendant Currey in the amended complaint as "a doctor

12 employed by DOC." Dkt. 66 at 3.  Defendants state that Defendant Currey is not a medical

13 provider of any kind but is a former Assistant Secretary for Health Services.  Dkt. 115 at 14.

14 They argue that she provided administrative oversight to health services in this role, and her only

15 involvement with Plaintiff was signing three of Plaintiff's grievances.  *Id.*  Plaintiff responds that

16 Defendant Currey contributed to his allegedly deficient medical care when she "concluded that

17 the [severe] pain Mr. Slack complained of is not supported" on level three appeal of Plaintiff's

18 grievances even though she was not trained in the medical field.  Dkt. 124 at 6.

19   Prison administrators may be liable for their participation in the denial of medical care

20 "when they knowingly fail to respond to an inmate's requests for help." *Jett v. Penner*, 439 F.3d

21 1091, 1098 (9th Cir. 2006).  However, the Ninth Circuit found, in a similar situation, that an

22 administrator's "decision to sign appeals that he knew had already been reviewed by at least two

23 qualified [medical professionals], when he had no expertise to contribute to that review," could

1   not constitute deliberate indifference to a serious medical need.  *Peralta v. Dillard*, 744 F.3d

2   1076, 1086 (9th Cir. 2014); *see also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009)

3   ("[A] denial of a grievance, by itself without any connection to the violation of constitutional

4   rights alleged by plaintiff, does not establish personal participation under § 1983."); *Lomholt v.*

5   *Holder*, 287 F.3d 683, 684 (8th Cir. 2002) ("[D]efendants' denial of [Plaintiff's] grievances did

6   not state a substantive constitutional claim[.]").

7        It appears that Defendant Currey's only participation in Plaintiff's medical care was to

8   review three of his grievances on level three appeal.  *See* Dkts. 116-1 at 232, 237, 240; 126 at

9   161, 187, 198.  The grievances appear to have been initially investigated and reviewed on level

10   two appeal by multiple medical professionals.  *See* Dkts. 116-1 at 230-31, 234-35, 238-39; 126 at

11   159-60, 184-85, 196-97.  Defendant Currey's responses to the appeals indicate that "Clinical

12   Nurse Educator N. Fernelius" also reviewed Plaintiff's grievances and contributed to the

13   responses.  Dkts. 116-1 at 232, 236, 240; 126 at 161, 186, 198.  Defendant Currey did not

14   personally contribute to the underlying alleged violation of constitutional rights, nor does her

15   signature on appeals that had already been reviewed by medical professionals expose her to

16   liability under Section 1983.  The Court recommends that Defendant Currey be DISMISSED as

17   a Defendant in this case.

18          3.  <u>Deliberate Indifference to a Serious Medical Need</u>

19        The government is obligated to provide inmates with medical care.  *Estelle v. Gamble*,

20   429 U.S. 97, 103 (1976).  Courts in the Ninth Circuit apply a two-part test to a claim of deficient

21   medical care under the Eighth Amendment: "First, the plaintiff must show a serious medical

22   need by demonstrating that failure to treat a prisoner's condition could result in further injury or

23   the unnecessary and wanton infliction of pain.  Second, the plaintiff must show the defendant's

response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (internal citations and quotation marks omitted).  Indications of a serious medical need include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  A prison official acts with deliberate indifference "only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Id.* at 1057 (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)) (alteration in original).  "An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019).  Likewise, a difference of opinion regarding appropriate treatment typically does not constitute deliberate indifference unless the chosen treatment was medically unacceptable under the circumstances. *Toguchi*, 391 F.3d at 1058.

Viewing the facts in the light most favorable to Plaintiff, it is clear that his left shoulder was in significant pain and that the presence of the masses on his back was upsetting and worrying to him.  However, the facts before the Court do not establish a causal connection between the masses and the pain.  To establish a "serious medical need" for purposes of an Eighth Amendment claim, Plaintiff must demonstrate that the failure to treat the condition *resulted in* the unnecessary or wanton infliction of pain.  Although Plaintiff argues that Defendants' delay in authorizing and scheduling surgery to remove the lumps caused his severe

pain, the record does not support this assertion. Plaintiff's medical records show that he had a number of medical issues in that area, including arthritis and bone spurs in his left shoulder and disc degeneration in his neck. The providers who examined Plaintiff informed him multiple times that his pain was more likely related to these ailments than to the growths on his back. Even after the lumps were removed and confirmed to be lipomas, Plaintiff continued to suffer from shoulder pain. Because Plaintiff has not presented any evidence that the lipomas were the cause of the severe pain in his shoulder, he has not established that Defendants disregarded a "severe medical need." The Court recommends that Defendants' motion for summary judgment (Dkt. 115) be GRANTED and this case be DISMISSED.

C. Plaintiff's Second Motion for Appointment of Counsel

1. Additional Procedural History

In Plaintiff's first motion for appointment of counsel, he argued that he was unable to afford counsel, his imprisonment would greatly limit his ability to litigate, the issues in the case were complex, a trial would likely involve conflicting testimony, he had limited legal knowledge, and he lacked law library access due to COVID-19 lockdown restrictions at his facility. Dkt. 38. The Court concluded that Plaintiff had not established exceptional circumstances justifying the appointment of counsel at that time, noting that Plaintiff had demonstrated an adequate ability to articulate his claims *pro se* despite his imprisonment and limited legal knowledge, including "a serviceable complaint as well as several motions which demonstrate he is able to sufficiently articulate the issues and his arguments and is capable of understanding and substantially complying with court rules." Dkt. 44.

After the Court granted Plaintiff's counsel's motion to withdraw as attorney, it declined to direct the appointment of substitute counsel. Dkt. 81. The Court again concluded there were

no exceptional circumstances warranting the appointment of counsel, reiterating that Plaintiff

had previously demonstrated an adequate ability to articulate his claims *pro se* and noting that he

had the additional advantage of proceeding on an amended and improved complaint prepared by

counsel. *Id.* at 7. The Court also pointed out that the likelihood of Plaintiff's success on the

merits remained uncertain, it was not clear that any significant discovery had occurred, and no

dispositive motions had been filed. *Id.*

Currently before the Court is Plaintiff's second motion for appointment of counsel. *See*

Dkts. 127, 128. He raises many of the same arguments in the current motion as in his first

motion. Plaintiff argues that the Court should appoint counsel to represent him because (1) the

relevant medical information is factually complex and will likely require expert testimony; (2)

the case hinges on conflicting testimony and "will be a credibility contest;" (3) he is indigent, has

no legal training, and has limited access to legal materials; (4) he does not have the legal skills

necessary to conduct a jury trial and "[the] large number of defendants, some of whom are

supervisory officials, present complex legal issues of determining which defendants were

sufficiently directly or indirectly involved in the constitutional violation to be held liable;" and

(5) he is likely to succeed on the merits of his case because his "allegation if proved would

clearly establish a constitutional violation." *Id.*

2. Legal Standards

Generally, a person has no right to counsel in a civil action. *See Campbell v. Burt*, 141

F.3d 927, 931 (9th Cir. 1998). In certain "exceptional circumstances," 28 U.S.C. § 1915(e)(1)

permits the Court to request the voluntary assistance of counsel for indigent civil litigants.

*Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004). When determining

whether "exceptional circumstances" exist, the Court considers "the likelihood of success on the

merits as well as the ability of the [plaintiff] to articulate his claims *pro se* in light of the

complexity of the legal issues involved." *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983);

*see also Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009) (finding that, where a *pro se* civil

rights plaintiff shows a good grasp of basic litigation procedure and has been able to articulate

claims adequately, he does not demonstrate exceptional circumstances required for appointment

of counsel). Neither factor is dispositive, and they must be viewed together before reaching a

decision on a request for counsel. *Weygandt*, 718 F.2d at 954.

The fact that a *pro se* litigant would be better served with the assistance of counsel is not

sufficient to show exceptional circumstances. *Rand v. Rowland*, 113 F.3d 1520, 1525 (9th Cir.

1997), *rev'd en banc on other grounds*, 154 F.3d 952 (9th Cir. 1998). Also, the need for

development of further facts does not necessarily make the legal issues involved sufficiently

complex to require appointment of counsel. *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th

Cir. 1986).

### 3. Plaintiff's Motion for Appointment of Counsel Should Be Denied

Once again, the Court concludes that Plaintiff has not established exceptional

circumstances justifying the appointment of counsel. As Defendants point out, Plaintiff has not

shown that his circumstances are any different than they were when the Court previously

considered this issue. His indigency and lack of legal training are not exceptional circumstances

requiring the assistance of counsel. Plaintiff was able to reasonably respond to Defendants'

motion for summary judgment and provide some evidence relating to his factual claims. The

Court's recommendation that summary judgment be granted for Defendants weighs against

appointment of counsel both because Plaintiff's case fails on the merits and because further

discovery and examination of witnesses is unnecessary.  Accordingly, the Court recommends that Plaintiff's second motion for appointment of counsel (Dkt. 127) be DENIED.

<u>CONCLUSION</u>

The Court recommends that Plaintiff's motion to strike (Dkt. 123) and second motion for appointment of counsel (Dkt. 127) be DENIED.  The Court further recommends that Plaintiff's unauthorized surreplies (Dkts. 135, 138) be STRICKEN, Defendants' motion for summary judgment (Dkt. 115) be GRANTED, and this case be DISMISSED with prejudice.  A proposed order accompanies this Report and Recommendation.

<u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on <u>**May 5, 2023**</u>.

Dated this 11th day of April, 2023.


S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 29